Amy R. Fitzpatrick (D.C. Bar # 458680)
David Altschuler (D.C. Bar # 983023)
Bindi Bhagat (PA Bar # 308788)
Barry Creech (D.C. Bar # 421070)
Claudia H. Dulmage (OH Bar # 0026543)
Scott I. Fitzgerald (WA Bar # 39716)
Kara Kuritz (D.C. Bar # 991349)
John Lohrer (D.C. Bar # 438989)
Jeffrey Vernon (D.C. Bar # 1009690)
U.S. Department of Justice, Antitrust Division
450 Fifth Street, N.W., Suite 4100
Washington, D.C. 20530
Phone: (202) 532-4558
Facsimile: (202) 307-5802
E-mail: amy.fitzpatrick@usdoj.gov

[Additional counsel listed on signature page]

Attorneys for Plaintiff United States of America

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

UNITED STATES OF AMERICA,

    *Plaintiff*,

    v.

FLAKEBOARD AMERICA LIMITED,

CELULOSA ARAUCO Y CONSTITUCIÓN, S.A.,

INVERSIONES ANGELINI Y COMPAÑÍA LIMITADA,

and

SIERRAPINE,

    *Defendants*.

Case No. 3:14-cv-4949

COMPLAINT—Page 1
Case No. 3:14-cv-4949

# COMPLAINT

The United States of America brings this civil antitrust action to challenge unlawful conduct by Flakeboard America Limited; its parent companies, Celulosa Arauco y Constitución, S.A., and Inversiones Angelini y Compañía Limitada; and SierraPine that occurred while the U.S. Department of Justice was reviewing Flakeboard's proposed acquisition of certain assets from SierraPine.

## I.     NATURE OF THE ACTION

1.      On January 13, 2014, Flakeboard and SierraPine executed an asset purchase agreement in which Flakeboard agreed to acquire SierraPine's particleboard mills in Springfield, Oregon, and Martell, California, and a medium-density fiberboard (MDF) mill in Medford, Oregon.  The total value of the proposed transaction was approximately $107 million, plus a variable amount for inventory.

2.      SierraPine's Springfield and Martell particleboard mills competed directly with Flakeboard's particleboard mill in Albany, Oregon.  Particleboard is an unfinished wood product that is widely used in countertops, shelving, low-end furniture, and other finished products.  Both companies also compete in the sale of MDF, a higher-end wood product that is widely used in furniture, kitchen cabinets, and decorative mouldings.

3.      The transaction exceeded thresholds established by Section 7A of the Clayton Act, 15 U.S.C. § 18a, also commonly known as the Hart–Scott–Rodino Antitrust Improvements Act of 1976, as amended ("Section 7A" or "HSR Act").  Consequently, the HSR Act required that the defendants make premerger notification filings with the Federal Trade Commission and Department of Justice and observe a waiting period before Flakeboard obtained beneficial ownership of SierraPine's business.  The waiting period seeks to ensure that the parties to a proposed transaction are preserved as independent entities while the reviewing agency—here, the Department of Justice—investigates the transaction and determines whether to challenge it.

4.      Instead of preserving SierraPine as an independent business, however, Flakeboard, Arauco, and SierraPine coordinated during the HSR waiting period to close SierraPine's Springfield mill and move the mill's customers to Flakeboard.  The mill was permanently shut down on March 13, 2014, months before the HSR waiting period expired.  On September 30, 2014, Flakeboard and SierraPine abandoned their proposed transaction in response to concerns expressed by the Department of Justice about the transaction's likely anticompetitive effects in the sale of MDF.

5.      The defendants' coordination to close Springfield and move the mill's customers to Flakeboard constituted a per se unlawful agreement between competitors to reduce output and allocate customers in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and prematurely transferred operational control of SierraPine's business to Flakeboard during the HSR waiting period in violation of Section 7A of the Clayton Act, 15 U.S.C. § 18a.

## II.      JURISDICTION, VENUE, AND INTERSTATE COMMERCE

6.      The United States brings this action under Section 4 of the Sherman Act, 15 U.S.C. § 4, seeking relief for the violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and under Section 7A of the Clayton Act, 15 U.S.C. § 18a, to recover civil penalties for the violation of the HSR Act.  This Court has jurisdiction over this action and the defendants under Section 7A(g) of the Clayton Act, 15 U.S.C. § 18a(g), 28 U.S.C. §§ 1331, 1337(a), 1345, and 1355.

7.      The defendants are engaged in, and their activities substantially affect, interstate commerce.

8.      The defendants have stipulated to venue and personal jurisdiction in this District.

## III.      THE DEFENDANTS

9.      Flakeboard America Limited is a Delaware corporation with its U.S. headquarters in Fort Mill, South Carolina.  Flakeboard and its related entities own numerous mills in North America that produce particleboard and MDF, including a particleboard mill in Albany, Oregon.

10.     Flakeboard's parent company is Celulosa Arauco y Constitución, S.A., a Chilean company headquartered in Santiago, Chile, that also produces particleboard and other products. Arauco oversees Flakeboard's operations in North America.

11.     Inversiones Angelini y Compañía Limitada is a Chilean corporation headquartered in Santiago, Chile.  Inversiones Angelini is a holding company and Flakeboard's ultimate parent entity, as defined by the Premerger Notification Rules, 16 C.F.R. § 800 *et seq.* Inversiones Angelini is also the ultimate parent entity of Arauco.

12.     SierraPine is a California limited partnership with its headquarters in Roseville, California.  SierraPine owns an operating particleboard mill in Martell, California; the closed particleboard mill in Springfield, Oregon; a closed particleboard mill in Adel, Georgia; and an operating MDF mill in Medford, Oregon.

## IV.     THE HSR ACT AND THE ASSET PURCHASE AGREEMENT

13.      The HSR Act imposes notification and waiting-period requirements on certain transactions that result in an acquiring person holding assets or voting securities valued above certain thresholds.  Section 801(c)(1) of the Premerger Notification Rules, 16 C.F.R. § 800 *et seq.*, defines "hold" to mean to have "beneficial ownership."  One way that an acquiring person may prematurely obtain beneficial ownership of assets or voting securities it plans to acquire is by obtaining operational control of the acquired person's business before the end of the HSR waiting period.  This conduct, sometimes referred to as "gun jumping," violates Section 7A.

14.     Section 7A(g)(1) of the Clayton Act, 15 U.S.C. § 18a(g)(1), states that any person, or any officer, director, or partner thereof, who fails to comply with any provision of the HSR Act is liable to the United States for a civil penalty for each day during which the person is in violation.  For the period relevant to the Complaint, the maximum civil penalty was $16,000 per defendant, per day, according to the Debt Collection Improvement Act of 1996, Pub. L. 104-134, § 31001(s) (amending the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C.

§ 2461 note), and Federal Trade Commission Rule 1.98, 16 C.F.R. § 1.98, 61 Fed. Reg. 54548 (Oct. 21, 1996).

15.     Flakeboard's proposed acquisition of SierraPine's mills was subject to the HSR Act.  On January 22, 2014, Flakeboard's ultimate parent entity, Inversiones Angelini, and SierraPine submitted premerger notification filings to the antitrust agencies as required by Section 7A.  The HSR waiting period expired on August 27, 2014, 30 days after Flakeboard and SierraPine certified compliance with the Antitrust Division's requests for additional information.

16.     Before negotiating the proposed acquisition, SierraPine had no plans to shut down the Springfield mill.  But during negotiations, Flakeboard made clear that it did not intend to operate Springfield after the transaction closed.  Flakeboard insisted that SierraPine close the mill because Flakeboard did not want to manage the shutdown, and its parent company, Arauco, was concerned that its reputation might be harmed if it announced the closure.

17.     Accordingly, SierraPine agreed in the asset purchase agreement (APA) to "take such actions as are reasonably necessary to shut down and close all business operations at its Springfield, Oregon facility five (5) days prior to the Closing."  The APA further provided that "in no event shall [SierraPine] be required to shut down or close its business operations at its Springfield, Oregon facility" until "[a]ny required waiting periods and approvals…under applicable Antitrust Law shall have expired or been terminated."  Consistent with these provisions, when Flakeboard and SierraPine executed the APA, they anticipated that SierraPine would announce and implement the Springfield closure immediately after the HSR waiting period expired, but before the transaction was consummated.

## V.     THE DEFENDANTS' UNLAWFUL CONDUCT

18.     Despite the defendants' intentions under the APA, they subsequently entered into a series of agreements and took other actions during the HSR waiting period to close SierraPine's Springfield mill and move the mill's customers to Flakeboard—conduct that together constituted

an unlawful agreement between competitors and prematurely transferred operational control of SierraPine's business to Flakeboard.

19.     On January 14, 2014, the day after executing the APA, the defendants announced Flakeboard's proposed acquisition of SierraPine's mills.  SierraPine did not announce the Springfield closure at that time because it intended to continue operating Springfield if the acquisition was not consummated and knew that employees and customers would start leaving the mill as soon as news of the planned closure became public.

20.     Within two days of the transaction's announcement, however, a labor issue arose that SierraPine believed would likely require it to publicly disclose the Springfield closure earlier than planned, while the transaction was still being reviewed by the Department of Justice. SierraPine immediately informed Flakeboard that the labor issue would require them to "share the pending news on Springfield…before we have early determination on [the] HSR."  The following week, SierraPine and Flakeboard discussed the Springfield closure announcement, its timing, and its ramifications.  During these discussions, the companies considered the possibility that Flakeboard might waive the provision requiring SierraPine to close the mill, which they expected would avert the need to announce the Springfield closure during the HSR waiting period.

21.     After consulting with Arauco, however, Flakeboard informed SierraPine that it would not waive the Springfield closure provision.  As a result, the companies understood that SierraPine would announce the Springfield closure during the HSR waiting period and that the mill would close within weeks of that announcement, without regard to whether the HSR waiting period had expired and regardless of whether the underlying transaction was ultimately consummated.  Consistent with this understanding, at the end of January, Flakeboard and SierraPine agreed on the content and timing of a press release announcing that Springfield would "cease operations in an orderly manner over the next few weeks" and that the mill would be "permanent[ly] clos[ed]."  SierraPine issued the press release on February 4, 2014, and ceased production at Springfield on March 13, 2014, months before the HSR waiting period expired.

22.     Flakeboard and SierraPine also agreed to transition Springfield's customers to Flakeboard's competing mill in Albany, Oregon.  In the period leading up to the Springfield closure announcement, SierraPine gave Flakeboard competitively sensitive information about Springfield's customers—including the name, contact information, and types and volume of products purchased by each Springfield customer—and Flakeboard distributed this information to its sales employees.  SierraPine also agreed to Flakeboard's request to delay the issuance of the press release from February 3 to February 4 so that Flakeboard could better position its sales personnel to contact Springfield's customers.

23.     In addition, at Flakeboard's request, SierraPine instructed its own sales employees to inform Springfield customers following the Springfield closure announcement that Flakeboard wanted to serve their business and would match SierraPine's prices.  Also at Flakeboard's request, SierraPine relayed assurances of future employment with Flakeboard to key SierraPine sales employees so that they would direct SierraPine's Springfield customers to Flakeboard.  A top Flakeboard sales manager underscored the purpose of these employment assurances: "Once that [Springfield closure] announcement is made the 74 [million square feet of particleboard] from Springfield becomes fair game.  I…want to make sure that the SierraPine sales group will be trying to direct the business to their new employer and to [Flakeboard's Albany mill]."

24.     After the Springfield closure announcement, SierraPine did not compete for most of Springfield's customers from its remaining particleboard mill in Martell, California, but instead directed these customers to Flakeboard, telling them that Flakeboard could meet their needs and would honor SierraPine's prices.  As SierraPine informed one Springfield customer, "We will try and transition all business to [Flakeboard's] Albany [mill]."

25.     With SierraPine's assistance, Flakeboard successfully secured a substantial amount of Springfield's business, including a significant number of new customers that Flakeboard had not previously served and additional business from customers that Springfield and Flakeboard's Albany mill both previously served.  The increased sales volumes from SierraPine's Springfield customers significantly increased Flakeboard's profits.

COMPLAINT—Page 7
Case No. 3:14-cv-4949

26.     Although Flakeboard and SierraPine subsequently abandoned their transaction on September 30, 2014, SierraPine's Springfield mill remains closed.  Virtually all of its employees have voluntarily left or been terminated.  Reopening the Springfield mill would be costly and time-consuming, and SierraPine has no plans to do so.

## VI.    VIOLATIONS ALLEGED

### FIRST CAUSE OF ACTION
### (Violation of Section 1 of the Sherman Act)

27.     Plaintiff realleges and incorporates the allegations in paragraphs 1 through 26 of this Complaint.

28.     Flakeboard and SierraPine are horizontal competitors in the sale of particleboard.

29.     Flakeboard, Arauco, and SierraPine's coordination to close SierraPine's particleboard mill in Springfield, Oregon, and to move the mill's customers to Flakeboard constituted a contract, combination, or conspiracy in restraint of trade that was unlawful under Section 1 of the Sherman Act, 15 U.S.C. § 1.  Their unlawful agreement was not reasonably necessary to achieve the procompetitive benefits of any legitimate business collaboration.

30.     Flakeboard, Arauco, and SierraPine's actions to close the Springfield mill and move its customers to Flakeboard were undertaken without any assurance that their transaction would be consummated and constituted an agreement between competitors to reduce output and allocate customers that is per se unlawful under Section 1 of the Sherman Act.

### SECOND CAUSE OF ACTION
### (Violation of Section 7A of the Clayton Act)

31.     Plaintiff realleges and incorporates the allegations in paragraphs 1 through 26 of this Complaint.

32.     Flakeboard's acquisition of SierraPine's mills was subject to Section 7A's premerger notification and waiting-period requirements.

COMPLAINT—Page 8
Case No. 3:14-cv-4949

33.     Flakeboard, after contracting to acquire SierraPine's assets under the APA, exercised operational control, and therefore obtained beneficial ownership, over SierraPine's business in violation of the HSR Act by:

      (a)     Coordinating with SierraPine to close the Springfield mill without regard to the HSR waiting period;

      (b)     Coordinating with SierraPine to move Springfield's customers to Flakeboard during the HSR waiting period, by, among other things:

            (i)     obtaining competitively sensitive information from SierraPine, including a customer list with the name, contact information, and types and volume of products purchased by each Springfield customer, and distributing this confidential information to Flakeboard sales employees;

            (ii)     delaying the Springfield closure announcement so that Flakeboard could better position its sales team to contact Springfield's customers;

            (iii)     directing SierraPine sales employees to inform Springfield customers that Flakeboard sought their business and would match SierraPine's prices; and

            (iv)     coordinating with SierraPine to offer assurances of future employment with Flakeboard to key SierraPine sales employees so that they would direct Springfield's customers to Flakeboard.

34.     Through these actions, Flakeboard exercised operational control, and therefore obtained beneficial ownership, of SierraPine's business before the HSR waiting period expired.

35.     The defendants were continuously in violation of Section 7A from on or about January 17, 2014, until the HSR waiting period expired on August 27, 2014.  Thus, Inversiones Angelini, as Flakeboard's ultimate parent entity (together with Arauco and Flakeboard) and SierraPine are each liable to the United States for a maximum civil penalty of $16,000 per day.

## VII.   REQUEST FOR RELIEF

36.   The United States requests that this Court:

(a)   adjudge and decree that Flakeboard, Arauco, and SierraPine engaged in an agreement, combination, or conspiracy that was unlawful under Section 1 of the Sherman Act;

(b)   award the United States such other relief, including equitable monetary relief, as the nature of this case may require and as is just and proper to prevent the recurrence of the alleged violation of Section 1 of the Sherman Act and to dissipate the anticompetitive effects of the violation;

(c)   adjudge and decree that the defendants violated the HSR Act and were in violation of the HSR Act during the period beginning on or about January 17, 2014, and ending on August 27, 2014;

(d)   order that Inversiones Angelini (together with Arauco and Flakeboard) and SierraPine each pay to the United States an appropriate civil penalty as provided under Section 7A(g)(1) of the Clayton Act, 15 U.S.C. § 18(a)(g)(1), and 16 C.F.R. § 1.98(a); and

(e)   award the United States the costs of this action.

Dated: November 7, 2014

Respectfully Submitted,

FOR PLAINTIFF UNITED STATES OF AMERICA:

 /s/ William J. Baer                              /s/ Amy R. Fitzpatrick
WILLIAM J. BAER                           AMY R. FITZPATRICK*
Assistant Attorney General for Antitrust      DAVID ALTSCHULER
                                          BINDI BHAGAT
LESLIE C. OVERTON                         BARRY CREECH
Deputy Assistant Attorney General         CLAUDIA H. DULMAGE
                                          SCOTT I. FITZGERALD
DAVID I. GELFAND                          KARA KURITZ
Deputy Assistant Attorney General         JOHN LOHRER
                                          JEFFREY VERNON
PATRICIA A. BRINK
Director of Civil Enforcement             Antitrust Division
                                          U.S. Department of Justice
MARK W. RYAN                              450 Fifth Street, N.W., Suite 4100
Director of Litigation                    Washington, D.C. 20530
                                          Phone: (202) 532-4558
PETER J. MUCCHETTI                        Facsimile: (202) 307-5802
Chief, Litigation I                       E-mail: amy.fitzpatrick@usdoj.gov

RYAN M. KANTOR                            Attorneys for the United States
Assistant Chief, Litigation I
                                          * Attorney of Record

COMPLAINT—Page 11
Case No. 3:14-cv-4949

## CERTIFICATE OF SERVICE

I certify that on November 7, 2014, I electronically filed this Complaint with the Clerk of

Court using the CM/ECF system.  A copy has also been sent via e-mail to:


Counsel for Flakeboard America Limited,
Celulosa Arauco y Constitución, S.A., and
Inversiones Angelini y Compañía Limitada:

      Andrew M. Lacy
      Simpson, Thacher & Bartlett LLP
      1155 F Street, N.W.
      Washington, D.C. 20004
      Phone: (202) 636-5505
      E-mail: alacy@stblaw.com


Counsel for SierraPine:

      Amanda P. Reeves
      Latham & Watkins LLP
      555 Eleventh Street N.W., Suite 1000
      Washington, D.C. 20004
      Phone: (202) 637-2183
      E-mail: amanda.reeves@lw.com


        /s/ Amy R. Fitzpatrick
      AMY R. FITZPATRICK
      Antitrust Division
      U.S. Department of Justice
      450 Fifth Street, N.W., Suite 4100
      Washington, D.C. 20530
      Phone: (202) 532-4558
      Facsimile: (202) 307-5802
      E-mail: amy.fitzpatrick@usdoj.gov