Amy R. Fitzpatrick (D.C. Bar # 458680)
David Altschuler (D.C. Bar # 983023)
Bindi Bhagat (PA Bar # 308788)
Scott I. Fitzgerald (WA Bar # 39716)
U.S. Department of Justice, Antitrust Division
450 Fifth Street, N.W., Suite 4100
Washington, D.C. 20530
Phone: (202) 532-4558
Facsimile: (202) 307-5802
E-mail: amy.fitzpatrick@usdoj.gov

Attorneys for Plaintiff United States of America

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>       *Plaintiff*,<br><br>       v.<br><br>FLAKEBOARD AMERICA LIMITED,<br><br>CELULOSA ARAUCO Y CONSTITUCIÓN, S.A.,<br><br>INVERSIONES ANGELINI Y COMPAÑÍA LIMITADA,<br><br>and<br><br>SIERRAPINE,<br><br>       *Defendants*. | Case No. 3:14-cv-4949 |

## COMPETITIVE IMPACT STATEMENT

The United States of America files this Competitive Impact Statement relating to the

proposed Final Judgment submitted for entry in this antitrust proceeding, as required by Section

2(b) of the Antitrust Procedures and Penalties Act ("APPA" or "Tunney Act"), 15 U.S.C. § 16(b)–(h).

## I.   NATURE AND PURPOSE OF THE PROCEEDING

On November 7, 2014, the United States filed a two-count Complaint against Flakeboard America Limited; its parent companies, Celulosa Arauco y Constitución, S.A., and Inversiones Angelini y Compañía Limitada; and SierraPine for engaging in unlawful conduct while Flakeboard's proposed transaction with SierraPine was under antitrust review.

Flakeboard and SierraPine compete in the sale of particleboard, an unfinished wood product that is widely used in countertops, shelving, and other finished products.  In January 2014, Flakeboard agreed to acquire three competing mills from SierraPine—two particleboard mills in Springfield, Oregon, and Martell, California, and a medium-density fiberboard (MDF) mill in Medford, Oregon.  This transaction exceeded the thresholds established by Section 7A of the Clayton Act, 15 U.S.C. § 18a, also commonly known as the Hart–Scott–Rodino Antitrust Improvements Act of 1976, as amended ("Section 7A" or "HSR Act"), and therefore required the defendants to notify the federal antitrust agencies of their proposed acquisition and observe a waiting period before Flakeboard could take control of SierraPine's business.  This waiting period seeks to ensure that the parties to a proposed transaction are preserved as independent entities while the reviewing agency—here, the Department of Justice—investigates the transaction and determines whether to challenge it.

Instead of preserving SierraPine as an independent business, however, the Complaint alleges that Flakeboard, Arauco, and SierraPine coordinated during the HSR waiting period to close SierraPine's Springfield mill and move the mill's customers to Flakeboard.  The mill was permanently shut down on March 13, 2014, months before the HSR waiting period expired.  On September 30, 2014, Flakeboard and SierraPine abandoned their proposed transaction in response to concerns expressed by the Department of Justice about the transaction's likely anticompetitive effects in the sale of MDF.  The Complaint alleges that the defendants' conduct

constituted a per se unlawful agreement between competitors to reduce output and allocate customers in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and a premature transfer of beneficial ownership to Flakeboard in violation of Section 7A of the Clayton Act, 15 U.S.C. § 18a.

The United States and the defendants have reached a proposed settlement that eliminates the need for a trial in this case. The proposed Final Judgment remedies the Sherman Act violation by enjoining Flakeboard, Arauco, and SierraPine from reaching similar anticompetitive agreements with competitors and requiring Flakeboard to disgorge $1.15 million of ill-gotten gains, the approximate amount of profits that Flakeboard illegally obtained by coordinating with SierraPine to close the Springfield mill and move the mill's customers to Flakeboard. To resolve the HSR Act violation, the proposed Final Judgment requires Inversiones Angelini (together with Flakeboard and Arauco) and SierraPine to each pay a civil penalty of $1.9 million, for a total of $3.8 million.

The United States and the defendants have stipulated that the proposed Final Judgment may be entered after compliance with the APPA. Entry of the proposed Final Judgment would terminate this action, except that the Court would retain jurisdiction to construe, modify, or enforce the provisions of the proposed Final Judgment and to punish any violations.

## II. DESCRIPTION OF THE EVENTS GIVING RISE TO THE ALLEGED VIOLATIONS

### A. The Defendants and the Proposed Acquisition

Flakeboard America Limited is a Delaware corporation with its U.S. headquarters in Fort Mill, South Carolina. Flakeboard and its related entities own numerous mills in North America that produce particleboard and MDF, including a particleboard mill in Albany, Oregon, that competes against SierraPine.

Flakeboard's parent company is Celulosa Arauco y Constitución, S.A., a Chilean company headquartered in Santiago, Chile, that also produces particleboard and other products. Arauco oversees Flakeboard's operations in North America.

Inversiones Angelini y Compañía Limitada is a Chilean corporation headquartered in Santiago, Chile. Inversiones Angelini is a holding company and Flakeboard's ultimate parent entity, as defined by the Premerger Notification Rules, 16 C.F.R. § 800 *et seq.* Inversiones Angelini is also the ultimate parent entity of Arauco.

SierraPine is a California limited partnership with its headquarters in Roseville, California. SierraPine owns an operating particleboard mill in Martell, California; the closed particleboard mill in Springfield, Oregon; a closed particleboard mill in Adel, Georgia; and an operating MDF mill in Medford, Oregon.

On January 13, 2014, Flakeboard and SierraPine entered into an asset purchase agreement (APA) in which Flakeboard agreed to acquire SierraPine's Medford, Martell, and Springfield mills for approximately $107 million, plus a variable amount for inventory. Before negotiating the APA, SierraPine had no plans to shut down the Springfield mill. During negotiations, however, Flakeboard made clear that it did not intend to operate Springfield after the transaction closed and insisted that SierraPine close the mill before the transaction was consummated. Thus, as part of the APA, SierraPine agreed to "take such actions as are reasonably necessary to shut down and close all business operations at its Springfield, Oregon facility" before the transaction closed. When the defendants executed the APA, they anticipated that SierraPine would announce and implement the Springfield mill closure immediately after the HSR waiting period expired, but before the transaction was consummated.

## B.  The Defendants' Unlawful Conduct

Despite the defendants' intentions under the APA, they subsequently entered into a series of agreements and took other actions during the HSR waiting period to close SierraPine's Springfield mill and move the mill's customers to Flakeboard.

The Complaint alleges that on January 14, 2014, the day after executing the APA, the defendants announced the proposed transaction.  At that time, SierraPine did not announce the Springfield closure because it intended to continue operating Springfield if the acquisition were not consummated and knew that employees and customers would start leaving the mill as soon as news of the planned closure became public.

Within two days of the transaction's announcement, however, a labor issue arose that SierraPine believed would likely require it to publicly announce the Springfield closure earlier than planned, while the transaction was still being reviewed by the Department of Justice. SierraPine immediately informed Flakeboard, notifying Flakeboard's president and an executive at Arauco on January 17, 2014, that "we need to have a discussion about [the] Springfield announcement" because the labor issue would force the companies to "share the pending news on Springfield" in early February "before we have early determination on [the] HSR." The following week, SierraPine and Flakeboard discussed the Springfield closure announcement, its timing, and its ramifications.  During these discussions, the companies considered the possibility that Flakeboard might waive the provision requiring SierraPine to close the mill, which they expected would avert the need to announce the Springfield closure during the HSR waiting period.

After consulting with Arauco, however, Flakeboard informed SierraPine that it would not waive the Springfield closure provision.  The Complaint alleges that as a result, the companies understood that SierraPine would announce the Springfield closure during the HSR waiting period and that the mill would close within weeks of that announcement, without regard to whether the HSR waiting period had expired and regardless of whether the underlying transaction was ultimately consummated.  Consistent with this understanding, at the end of January, Flakeboard and SierraPine agreed on the content and timing of a press release announcing that Springfield would be permanently closed.  SierraPine issued the press release on February 4, 2014, and ceased production at Springfield on March 13, 2014, months before the HSR waiting period expired.

COMPETITIVE IMPACT STATEMENT—Page 5
Case No. 3:14-cv-4949

The Complaint further alleges that Flakeboard and SierraPine agreed to transition Springfield's customers to Flakeboard's competing mill in Albany, Oregon, in several ways. First, in the period leading up to the Springfield closure announcement, SierraPine gave Flakeboard competitively sensitive information about Springfield's customers—including the name, contact information, and types and volume of products purchased by each Springfield customer—and Flakeboard distributed this information to its sales employees.

Second, SierraPine agreed to Flakeboard's request to delay the issuance of the press release from February 3 to February 4 so that Flakeboard could better position its sales personnel to contact Springfield's customers.

Third, at Flakeboard's request, SierraPine instructed its own sales employees to inform Springfield customers following the Springfield closure announcement that Flakeboard wanted to serve their business and would match SierraPine's prices.

Fourth, also at Flakeboard's request, SierraPine relayed assurances of future employment with Flakeboard to key SierraPine sales employees so that they would direct SierraPine's Springfield customers to Flakeboard.

As a result of these actions, the Complaint alleges that Flakeboard successfully secured a substantial amount of Springfield's business, including a significant number of new customers that Flakeboard had not previously served. The increased sales volumes from SierraPine's Springfield customers significantly increased Flakeboard's profits.

Today, although Flakeboard and SierraPine abandoned their proposed transaction, the Springfield mill remains closed and virtually all of its employees have voluntarily left or been terminated. Furthermore, as the Complaint alleges, reopening the Springfield mill would be costly and time-consuming, and SierraPine has no plans to do so.

## C.   The Defendants' Antitrust Violations

### 1.   *Section 1 of the Sherman Act*

Section 1 of the Sherman Act prohibits any "contract, combination…or conspiracy…in restraint of trade."  This prohibition remains in force during the premerger period: the pendency of a proposed transaction does not excuse transacting parties of their obligations to compete independently.  Thus, until a transaction is consummated, a party that coordinates with its rival on price, output, or other competitively significant matters may violate Section 1.

Here, Flakeboard, Arauco, and SierraPine's coordination to close the Springfield mill and move the mill's customers to Flakeboard constituted an agreement between competitors that is per se unlawful.  *See National Collegiate Athletic Ass'n v. Board of Regents*, 468 U.S. 85, 100 (1984) (holding that the per se rule ordinarily applies to agreements to reduce output); *Palmer v. BRG of Georgia, Inc.*, 498 U.S. 46, 49 (1990) (affirming the per se rule for horizontal market allocations).  The defendants' agreement eliminated the Springfield mill's output and allocated the mill's customers.  This type of agreement, because of its "pernicious effect on competition and lack of any redeeming virtue," is presumed to be unreasonable without an elaborate inquiry into its precise harm or potential business justification.  *Northern Pac. Ry. v. United States*, 356 U.S. 1, 5 (1958).

Furthermore, no special circumstances justified the unlawful agreement or exempted it from per se treatment.  This agreement was not reasonably necessary to achieve any procompetitive benefits of the transaction, and therefore does not qualify as an ancillary restraint.  The agreement also was undertaken without any assurance that the transaction would be consummated.

### 2.   *The HSR Act (Section 7A of the Clayton Act)*

The Complaint also alleges that Flakeboard exercised operational control over SierraPine's business during the HSR waiting period in violation of the HSR Act.  Because the payment of

civil penalties under the HSR Act is not subject to the Tunney Act,[1] the civil-penalties component of the proposed Final Judgment is not open to public comment.  Nevertheless, this Competitive Impact Statement explains the Antitrust Division's views regarding the defendants' violations of the HSR Act.

Before the HSR Act was enacted, the DOJ and the FTC were often forced to investigate anticompetitive mergers that had already been consummated without public notice.  In those situations, the agencies' only recourse was to sue to unwind the parties' merger, and the merged firm often delayed the litigation so that years elapsed before adjudication and attempted relief.  During this extended time, the loss of competition continued to harm consumers, and if the court ultimately found that the merger was illegal, effective relief was often impossible to achieve.

The HSR Act addressed these problems and strengthened antitrust enforcement by providing the antitrust agencies the ability to investigate certain large acquisitions before they are consummated.  In particular, the HSR Act prohibits certain acquiring parties from undertaking their acquisition before a prescribed waiting period expires or is terminated.  Throughout the waiting period, the parties must remain separate and preserve their status as independent economic actors.  Indeed, the legislative history of the HSR Act underscores Congress's desire that competition existing before the merger should be maintained to the extent possible pending review by the antitrust agencies and the court.

Instead of preserving SierraPine as an independent entity, however, the Complaint alleges that Flakeboard exercised operational control over SierraPine's business during the HSR waiting period in several ways.  First, Flakeboard coordinated with SierraPine to close the Springfield mill without regard to the HSR waiting period.  Flakeboard then coordinated with SierraPine to

---

[1] *See, e.g.*, *United States v. Berkshire Hathaway Inc.*, 2014-2 Trade Cas. (CCH) ¶ 78,870 (D.D.C.) (entering a consent judgment for civil penalties under the HSR Act without employing Tunney Act procedures); *United States v. Barry Diller*, 2013-1 Trade Cas. (CCH) ¶ 78,446 (D.D.C.) (same); *United States v. MacAndrews & Forbes Holdings, Inc.*, 2013-1 Trade Cas. (CCH) ¶ 78,443 (D.D.C.) (same).

move Springfield's customers to Flakeboard during the HSR waiting period. For example, as the Complaint alleges:

- Flakeboard obtained competitively sensitive information from SierraPine, including a customer list with the name, contact information, and types and volume of products purchased by each Springfield customer, and distributed that information to Flakeboard sales employees.

- Flakeboard had SierraPine delay the Springfield closure announcement so that Flakeboard could better position its sales team to contact Springfield's customers.

- Flakeboard directed SierraPine sales employees to inform Springfield customers that Flakeboard sought their business and would match SierraPine's prices.

- Flakeboard coordinated with SierraPine to offer assurances of future employment with Flakeboard to key SierraPine sales employees so that they would direct Springfield's customers to Flakeboard.

These actions undermined the purpose of the HSR Act, which is designed to allow the antitrust agencies to conduct an investigation before the parties have combined their operations or transferred significant assets.

### III. EXPLANATION OF THE PROPOSED FINAL JUDGMENT

The proposed Final Judgment remedies the Sherman Act violation by requiring disgorgement and injunctive relief and addresses the HSR Act violation by requiring monetary civil penalties. Section XII of the proposed Final Judgment states that these provisions will expire ten years after entry of the Final Judgment.

## A. Disgorgement

### 1. Disgorgement is an appropriate remedy.

The proposed Final Judgment requires Flakeboard to disgorge the profits that it earned as a result of its unlawful agreement with SierraPine. Disgorgement is an equitable remedy that seeks to "deprive a wrongdoer of unjust enrichment." *SEC v. Platforms Wireless Intern. Corp.*, 617 F.3d 1072, 1096 (9th Cir. 2010) (citation omitted). Disgorgement also protects the public by deterring illegal conduct. *See, e.g.*, *SEC v. First Pac. Bancorp*, 142 F.3d 1186, 1191 (9th Cir. 1998). The amount of disgorgement "should include all gains flowing from the illegal activities," and "need be only a reasonable approximation of profits causally connected to the violation." *Platforms Wireless*, 617 F.3d at 1096 (internal quotation marks and citations omitted).

In *United States v. Keyspan Corp.*, 763 F. Supp. 2d 633, 638–41 (S.D.N.Y. 2011), the court held that the government may seek disgorgement in antitrust suits brought (like this one) under the Sherman Act. The court in *Keyspan* concluded that disgorgement under the Sherman Act was within a district court's inherent equitable powers and fully consistent with "established principles of antitrust law." *Id.* at 639–40. In reaching this conclusion, the court observed that "there appear[ed] to be little disagreement among commentators about the propriety of disgorgement as an antitrust remedy," citing to the leading antitrust law treatise's conclusion that "equity relief may include, where appropriate, the disgorgement of improperly obtained gains." *Id.* at 640 (quoting Areeda & Hovenkamp, *Antitrust Law* ¶ 325a (3d ed. 2007)).

Furthermore, both the Ninth Circuit and this Court have affirmed the district court's authority to award disgorgement to governmental entities enforcing federal statutory provisions. *See, e.g.*, *First Pac. Bancorp*, 142 F.3d at 1191–92 (authorizing disgorgement for violations of the securities laws); *FTC v. Neovi, Inc.*, 604 F.3d 1150, 1159–60 (9th Cir. 2010) (authorizing disgorgement under the FTC Act); *FTC v. Silueta Distribs.*, 1995 WL 215313, at *7–8 (N.D. Cal. Feb. 24, 1995) (same). And the Ninth Circuit has emphasized the need for "broad equity powers

to enforce the antitrust laws." *United States v. Coca-Cola Bottling Co. of Los Angeles*, 575 F.2d 222, 229 (9th Cir. 1978).

### 2. Disgorgement is appropriate in this case.

Here, disgorgement is necessary to ensure that Flakeboard is not unjustly enriched by the profits that it earned by coordinating with SierraPine to close the Springfield mill and move the mill's customers to Flakeboard. As the Complaint alleges, Flakeboard secured a substantial amount of Springfield's business for its Albany mill, including new customers that Albany had not previously served and additional sales from customers that were previously purchasing from both mills. From this business, Flakeboard earned approximately $1.15 million in illegally obtained profits during the six-month period leading up to this settlement, which is equal to the disgorgement amount required by the proposed Final Judgment.

Disgorgement is also appropriate here because the injunctive relief that would most likely restore competition—requiring the mill to be reopened—is impractical. As alleged in the Complaint, the Springfield mill has been closed for several months and virtually all of its employees have either left the mill or been terminated. Furthermore, in this case, no other remedy would be as effective to fulfill the goal of the Sherman Act to "prevent and restrain" antitrust violations. 15 U.S.C. § 4. Disgorgement will deter Flakeboard and others from participating in anticompetitive conduct in the context of a pending transaction, regardless of whether the transaction is subject to the HSR Act.

## B. Injunctive Provisions

### 1. Prohibited conduct

Section VII.A of the proposed Final Judgment is designed to prevent future Sherman Act violations during a pending transaction, regardless of whether the transaction is subject to the HSR Act. Under this provision, Flakeboard, Arauco, and SierraPine may not reach agreements while a transaction is pending that affect price or output for competing products in the United States or that allocate markets or customers. The prohibited agreements also include those

involving disclosure of competitively sensitive information, except as allowed in Section VIII, or the closure of a production facility that produces a competing product without giving prior written notice to and obtaining written approval from the United States. Although an agreement to close a production facility before a transaction is consummated may be permissible under certain circumstances, this notice-and-approval provision ensures that, in light of the defendants' conduct, they will not take additional actions that reduce competition or interfere with a potential antitrust review.

### 2. *Permitted conduct*

Section VIII of the proposed Final Judgment identifies conduct that is permitted by the Final Judgment. Sections VIII.A and VIII.B ensure that the decree will not be interpreted to forbid certain "conduct of business" covenants that are common in merger agreements. For example, Section VIII.A allows agreements requiring a seller to operate its business in the ordinary course of business. And Section VIII.B allows for "material adverse change" provisions, which give the acquiring firm certain rights to prevent a to-be-acquired firm from materially changing how it conducts its business. These common provisions are intended to protect a transaction's value and prevent a to-be-acquired firm from wasting assets.

Section VIII.C recognizes a narrow exception to Section VII.A.3's prohibition on exchanging competitively sensitive information. As a general rule, competitors should not obtain prospective, customer-specific price information before consummating a transaction because it could be used to harm competition if the transaction is abandoned. Nevertheless, a prospective acquirer may need information about pending contracts to properly value a business during the due-diligence process.

Section VIII.E clarifies that the proposed Final Judgment does not prohibit the defendants from entering into buyer-seller agreements that would have been lawful independent of the proposed transaction.

### 3. *Compliance and inspection*

Sections IX and X of the proposed Final Judgment establish procedures to ensure that the defendants comply with the antitrust laws and the terms of the Final Judgment.  Section IX requires Flakeboard and SierraPine to maintain an antitrust compliance program, which includes naming an antitrust compliance officer responsible for supervising compliance with the Final Judgment.  The compliance officer must distribute a copy of the Final Judgment to the company's officers, directors, and any other employees responsible for mergers and acquisitions, and must provide a copy of the Final Judgment to any potential partners to a merger or acquisition.  In addition, Arauco must distribute a copy of the Final Judgment to each of its officers, directors, and any other employees responsible for any business in the United States.

To further ensure that the defendants are complying with the Final Judgment, Section X grants the DOJ access, upon reasonable notice, to the defendants' records and documents relating to matters contained in the Final Judgment.  The defendants must also make their personnel available for interviews or depositions regarding such matters.  In addition, upon request, the defendants must prepare written reports relating to matters contained in the Final Judgment.

## C.  Civil Penalties under the HSR Act

Under Section 7A(g)(1) of the Clayton Act, 15 U.S.C. § 18a(g)(1), any person who fails to comply with the HSR Act is liable to the United States for a civil penalty of not more than $16,000 for each day that the person is in violation of the Act.[2]  The Complaint alleges that the defendants were in violation of the HSR Act from on or about January 17, 2014, when Flakeboard, Arauco, and SierraPine began coordinating on the closure of the Springfield mill, until the expiration of the statutory waiting period on August 27, 2014—a period of 223 days.

Although the United States was prepared to seek the maximum civil penalty of $3.568 million for both Inversiones Angelini (together with Arauco and Flakeboard) and SierraPine at

---

[2] *Id.*; *see also* Pub. L. 104-134 § 31001(s) (Debt Collection Improvement Act of 1996); 16 C.F.R. § 1.98(a) (increasing maximum penalty to $16,000 per day).

trial, other factors led to acceptance of $1.9 million each as an appropriate penalty for settlement purposes. In particular, a lower penalty is appropriate because Flakeboard and SierraPine cooperated with the United States during its investigation by voluntarily producing evidence of their unlawful premerger conduct and, despite the daily accruing fine, entering into a timing agreement that resulted in an orderly production of documents relating to their proposed acquisition.

## IV.   REMEDIES AVAILABLE TO POTENTIAL PRIVATE LITIGANTS

Section 4 of the Clayton Act, 15 U.S.C. § 15, provides that any person who has been injured as a result of conduct prohibited by the antitrust laws may bring suit in federal court to recover three times the damages the person has suffered, as well as costs and reasonable attorneys' fees. Entry of the proposed Final Judgment will neither impair nor assist the bringing of any private antitrust damage action. Under Section 5(a) of the Clayton Act, 15 U.S.C. § 16(a), the proposed Final Judgment has no prima facie effect in any subsequent private lawsuit that may be brought against the defendants.

## V.   PROCEDURES AVAILABLE FOR MODIFICATION OF THE PROPOSED FINAL JUDGMENT

The United States and the defendants have stipulated that the proposed Final Judgment may be entered by the Court after compliance with the provisions of the APPA unless the United States has withdrawn its consent. The APPA conditions entry upon the Court's determination that the proposed Final Judgment is in the public interest.

The APPA provides a period of at least 60 days preceding the effective date of the proposed Final Judgment within which any person may submit to the United States written comments regarding the proposed Final Judgment. Any person who wishes to comment should do so within 60 days of the date of publication of this Competitive Impact Statement in the Federal Register, or the last date of publication in a newspaper of the summary of this Competitive Impact Statement, whichever is later. All comments received during this period will be

considered by the U.S. Department of Justice, which remains free to withdraw its consent to the proposed Final Judgment at any time before the Court's entry of judgment. The comments and the response of the United States will be filed with the Court. In addition, comments will be posted on the U.S. Department of Justice, Antitrust Division's internet website and, under certain circumstances, published in the Federal Register.

Written comments should be submitted to:

> Peter J. Mucchetti
> Chief, Litigation I Section
> Antitrust Division
> United States Department of Justice
> 450 Fifth Street, N.W., Suite 4100
> Washington, D.C. 20530

The proposed Final Judgment provides that the Court retains jurisdiction over this action, and the parties may apply to the Court for any order necessary or appropriate for the modification, interpretation, or enforcement of the Final Judgment.

## VI.    ALTERNATIVES TO THE PROPOSED FINAL JUDGMENT

The United States considered, as an alternative to the proposed Final Judgment, a full trial on the merits against the defendants. The United States is satisfied, however, that the proposed relief, including the disgorgement of profits and payment of civil penalties, is an appropriate remedy in this matter. The proposed relief should deter the defendants and others from engaging in similar conduct. Furthermore, given the facts of this case, the proposed Final Judgment would achieve all or substantially all of the relief the United States would have obtained through litigation, but avoids the time, expense, and uncertainty of a full trial on the merits of the Complaint.

## VII.   STANDARD OF REVIEW UNDER THE APPA
## FOR THE PROPOSED FINAL JUDGMENT

The Clayton Act, as amended by the APPA, requires that proposed consent judgments in antitrust cases brought by the United States be subject to a 60-day comment period, after which

COMPETITIVE IMPACT STATEMENT—Page 15
Case No. 3:14-cv-4949

the court shall determine whether entry of the proposed Final Judgment "is in the public interest." 15 U.S.C. § 16(e)(1).  In making that determination, the court, in accordance with the statute as amended in 2004, is required to consider:

> (A) the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration of relief sought, anticipated effects of alternative remedies actually considered, whether its terms are ambiguous, and any other competitive considerations bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest; and
>
> (B) the impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial.

15 U.S.C. § 16(e)(1)(A) & (B).  In considering these statutory factors, the court's inquiry is necessarily a limited one as the government is entitled to "broad discretion to settle with the defendant within the reaches of the public interest."  *United States v. Microsoft Corp.*, 56 F.3d 1448, 1461 (D.C. Cir. 1995); *see also United States v. U.S. Airways Group, Inc.*, No. 13-cv-1236 (CKK), 2014-1 Trade Cas. (CCH) ¶ 78, 748, 2014 U.S. Dist. LEXIS 57801, at *16–17 (D.D.C. Apr. 25, 2014) (same); *see generally United States v. SBC Commc'ns, Inc.*, 489 F. Supp. 2d 1 (D.D.C. 2007) (describing the public-interest standard under the Tunney Act); *United States v. InBev N.V./S.A.*, No. 08-1965 (JR), 2009-2 Trade Cas. (CCH) ¶ 76,736, 2009 U.S. Dist. LEXIS 84787, at *3 (D.D.C. Aug. 11, 2009) (noting that the court's review of a consent judgment is limited and only inquires "into whether the government's determination that the proposed remedies will cure the antitrust violations alleged in the complaint was reasonable, and whether the mechanisms to enforce the final judgment are clear and manageable.").[3]

---

[3] The 2004 amendments substituted "shall" for "may" in directing relevant factors for courts to consider and amended the list of factors to focus on competitive considerations and to address potentially ambiguous judgment terms.  *Compare* 15 U.S.C. § 16(e) (2004), *with* 15 U.S.C. § 16(e)(1) (2006); *see also SBC Commc'ns*, 489 F. Supp. 2d at 11 (concluding that the 2004 amendments "effected minimal changes" to Tunney Act review).

As the D.C. Circuit has held, under the APPA a court considers, among other things, the relationship between the remedy secured and the specific allegations set forth in the government's complaint, whether the decree is sufficiently clear, whether enforcement mechanisms are sufficient, and whether the decree may positively harm third parties. *See Microsoft*, 56 F.3d at 1458–62. With respect to the adequacy of the relief secured by the decree, a court may not "engage in an unrestricted evaluation of what relief would best serve the public." *United States v. BNS, Inc.*, 858 F.2d 456, 462 (9th Cir. 1988) (quoting *United States v. Bechtel Corp.*, 648 F.2d 660, 666 (9th Cir. 1981)); *see also Microsoft*, 56 F.3d at 1460–62; *United States v. Alcoa, Inc.*, 152 F. Supp. 2d 37, 40 (D.D.C. 2001); *InBev*, 2009 U.S. Dist. LEXIS 84787, at *3. Courts have held that:

> [t]he balancing of competing social and political interests affected by a proposed antitrust consent decree must be left, in the first instance, to the discretion of the Attorney General. The court's role in protecting the public interest is one of [e]nsuring that the government has not breached its duty to the public in consenting to the decree. The court is required to determine not whether a particular decree is the one that will best serve society, but whether the settlement is "*within the reaches of the public interest*." More elaborate requirements might undermine the effectiveness of antitrust enforcement by consent decree.

*Bechtel*, 648 F.2d at 666 (emphasis added) (citations omitted).[4] In determining whether a proposed settlement is in the public interest, a district court "must accord deference to the government's predictions about the efficacy of its remedies, and may not require that the remedies perfectly match the alleged violations." *SBC Commc'ns*, 489 F. Supp. 2d at 17; *see also U.S. Airways*, 2014 U.S. Dist. LEXIS 57801, at *16 (noting that a court should not reject the

---

[4] *Cf. BNS*, 858 F.2d at 464 (holding that the court's "ultimate authority under the [APPA] is limited to approving or disapproving the consent decree"); *United States v. Gillette Co.*, 406 F. Supp. 713, 716 (D. Mass. 1975) (noting that, in this way, the court is constrained to "look at the overall picture not hypercritically, nor with a microscope, but with an artist's reducing glass"). *See generally Microsoft*, 56 F.3d at 1461 (discussing whether "the remedies [obtained in the decree are] so inconsonant with the allegations charged as to fall outside of the 'reaches of the public interest'").

proposed remedies because it believes others are preferable); *Microsoft*, 56 F.3d at 1461 (noting the need for courts to be "deferential to the government's predictions as to the effect of the proposed remedies"); *United States v. Archer-Daniels-Midland Co.*, 272 F. Supp. 2d 1, 6 (D.D.C. 2003) (noting that the court should grant due respect to the United States' prediction as to the effect of proposed remedies, its perception of the market structure, and its views of the nature of the case).

Courts have greater flexibility in approving proposed consent decrees than in crafting their own decrees following a finding of liability in a litigated matter. "[A] proposed decree must be approved even if it falls short of the remedy the court would impose on its own, as long as it falls within the range of acceptability or is 'within the reaches of public interest.'" *United States v. Am. Tel. & Tel. Co.*, 552 F. Supp. 131, 151 (D.D.C. 1982) (citations omitted); *see also U.S. Airways*, 2014 U.S. Dist. LEXIS 57801, at *18 (noting that room must be made for the government to grant concessions in the negotiation process for settlements (citing *Microsoft*, 56 F.3d at 1461)); *United States v. Alcan Aluminum Ltd.*, 605 F. Supp. 619, 622 (W.D. Ky. 1985) (approving the consent decree even though the court would have imposed a greater remedy). To meet this standard, the United States "need only provide a factual basis for concluding that the settlements are reasonably adequate remedies for the alleged harms." *SBC Commc'ns*, 489 F. Supp. 2d at 17.

Moreover, the court's role under the APPA is limited to reviewing the remedy in relationship to the violations that the United States has alleged in its Complaint, and does not authorize the court to "construct [its] own hypothetical case and then evaluate the decree against that case." *Microsoft*, 56 F.3d at 1459; *see also U.S. Airways*, 2014 U.S. Dist. LEXIS 57801, at *18 (noting that the court must simply determine whether there is a factual foundation for the government's decisions such that its conclusions regarding the proposed settlements are reasonable); *InBev*, 2009 U.S. Dist. LEXIS 84787, at *20 ("the 'public interest' is not to be measured by comparing the violations alleged in the complaint against those the court believes could have, or even should have, been alleged"). Because the "court's authority to review the decree depends

entirely on the government's exercising its prosecutorial discretion by bringing a case in the first place," it follows that "the court is only authorized to review the decree itself," and not to "effectively redraft the complaint" to inquire into other matters that the United States did not pursue.  *Microsoft*, 56 F.3d at 1459–60.  As the court recently confirmed in *SBC Communications*, courts "cannot look beyond the complaint in making the public interest determination unless the complaint is drafted so narrowly as to make a mockery of judicial power."  *SBC Commc'ns*, 489 F. Supp. 2d at 15.

In its 2004 amendments, Congress made clear its intent to preserve the practical benefits of using consent decrees in antitrust enforcement, adding the unambiguous instruction that "[n]othing in this section shall be construed to require the court to conduct an evidentiary hearing or to require the court to permit anyone to intervene."  15 U.S.C. § 16(e)(2); *see also U.S. Airways*, 2014 U.S. Dist. LEXIS 57801, at *20 (noting that a court is not required to hold an evidentiary hearing or to permit intervenors as part of its review under the Tunney Act).  The language captured Congress's intent when it enacted the Tunney Act in 1974, as Senator Tunney explained: "The court is nowhere compelled to go to trial or to engage in extended proceedings which might have the effect of vitiating the benefits of prompt and less costly settlement through the consent decree process."  119 Cong. Rec. 24,598 (1973) (statement of Sen. Tunney).  Rather, the procedure for the public-interest determination is left to the discretion of the court, with the recognition that the court's "scope of review remains sharply proscribed by precedent and the nature of Tunney Act proceedings."  *SBC Commc'ns*, 489 F. Supp. 2d at 11.[5]  A court can make

---

[5] *See United States v. Enova Corp.*, 107 F. Supp. 2d 10, 17 (D.D.C. 2000) (noting that the "Tunney Act expressly allows the court to make its public interest determination on the basis of the competitive impact statement and response to comments alone"); *United States v. Mid-Am. Dairymen, Inc.*, No. 73-CV-681-W-1, 1977-1 Trade Cas. (CCH) ¶ 61,508, at 71,980, *22 (W.D. Mo. 1977) ("Absent a showing of corrupt failure of the government to discharge its duty, the Court, in making its public interest finding, should…carefully consider the explanations of the government in the competitive impact statement and its responses to comments in order to determine whether those explanations are reasonable under the circumstances."); S. Rep. No. 93-298, at 6 (1973) ("Where the public interest can be meaningfully evaluated simply on the basis of briefs and oral arguments, that is the approach that should be utilized.").

its public-interest determination based on the competitive impact statement and response to public comments alone.  *U.S. Airways*, 2014 U.S. Dist. LEXIS 57801, at *21.

## VIII.   DETERMINATIVE DOCUMENTS

There are no determinative materials or documents within the meaning of the APPA that were considered by the United States in formulating the proposed Final Judgment.

Respectfully submitted,


 /s/ Amy R. Fitzpatrick
Amy R. Fitzpatrick
David Altschuler
Bindi Bhagat
Scott I. Fitzgerald

Attorneys for the United States
Antitrust Division
U.S. Department of Justice
450 Fifth Street, N.W., Suite 4100
Washington, D.C. 20530

Dated: November 7, 2014

**CERTIFICATE OF SERVICE**

I certify that on November 7, 2014, I electronically filed this Complaint with the Clerk of Court using the CM/ECF system.  A copy has also been sent via e-mail to:

Counsel for Flakeboard America Limited,
Celulosa Arauco y Constitución, S.A., and
Inversiones Angelini y Compañía Limitada:

     Andrew M. Lacy
     Simpson, Thacher & Bartlett LLP
     1155 F Street, N.W.
     Washington, D.C. 20004
     Phone: (202) 636-5505
     E-mail: alacy@stblaw.com

Counsel for SierraPine:

     Amanda P. Reeves
     Latham & Watkins LLP
     555 Eleventh Street N.W., Suite 1000
     Washington, D.C. 20004
     Phone: (202) 637-2183
     E-mail: amanda.reeves@lw.com

       /s/ Amy R. Fitzpatrick
      AMY R. FITZPATRICK
      Antitrust Division
      U.S. Department of Justice
      450 Fifth Street, N.W., Suite 4100
      Washington, D.C. 20530
      Phone: (202) 532-4558
      Facsimile: (202) 307-5802
      E-mail: amy.fitzpatrick@usdoj.gov